## United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ruben Castillo | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 03 C 5075 | **DATE** | 4/29/2004 |
| **CASE TITLE** | Robert Tong, et al. vs. The Chicago Park District | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Defendant Chicago Park District's motion for summary judgment [26-1] is denied. Plaintiffs Robert and Mildred Tongs' motion for summary judgment [30-1] is granted. Judgment is entered in favor of the plaintiffs and against the defendant.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | Document Number |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | APR 30 2004 | date docketed | |
| ✓ | Docketing to mail notices. | | docketing deputy initials | |
| ✓ | Mail AO 450 form. | | | |
| | Copy to judge/magistrate judge. | | | |
| RO | courtroom deputy's initials | U.S. DISTRICT COURT | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| ROBERT TONG and MILDRED TONG, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 03 C 5075 |
| | ) | |
| THE CHICAGO PARK DISTRICT, an | ) | Judge Ruben Castillo |
| Illinois unit of local government, | ) | |
| | ) | |
| Defendant. | ) | **DOCKETED** |

APR 3 0 2004

## MEMORANDUM OPINION AND ORDER

This case presents important issues of First Amendment law and highlights the friction that the Free Speech and Establishment Clauses generate when they come into close contact. In 2002, the defendant Chicago Park District ("CPD") approved and oversaw a park fundraiser in which community members were invited to purchase a brick that would be engraved with an inscription chosen by the donor and included in a walkway in a neighborhood park. Plaintiffs Robert and Mildred Tong (the "Tongs") submitted a proposal for a brick engraving that included the phrase "Jesus is the cornerstone." The CPD rejected the Tongs' proposal based on its religious content, and the Tongs filed the present action seeking declaratory and injunctive relief, and nominal damages. The CPD argues that the brick walkway is a nonpublic or limited public forum and that its policy of rejecting proposed engravings with religious content was reasonable and viewpoint neutral. The Tongs argue that the CPD had no coherent policy for reviewing proposed brick engravings and that CPD officials had unbridled discretion in analyzing whether to accept or reject a brick. The Tongs further argue that the CPD's decision to reject their proposed engraving was based on unconstitutional viewpoint discrimination. The Tongs and the

CPD have filed cross-motions for summary judgment. (R. 26-1, Def.'s Mot.; R. 30-1, Pls.' Mot.) At issue in this case is whether the CPD's decision to reject the Tongs' proposed engraving violated the Tongs' Free Speech, Free Exercise, and Equal Protection rights under the United States and Illinois Constitutions. We conclude, for the reasons set forth herein, that the CPD's actions violated the Tongs' First Amendment rights. Therefore, we deny the CPD's motion, (R. 26-1), and grant the Tongs' motion, (R. 30-1).

## RELEVANT FACTS[1]

The CPD is a governmental unit that is empowered by Illinois law to supervise and control the operation of parks in Chicago and to create regulations in furtherance of that power. (R. 27, Joint Stip. Facts, ¶¶ 5-6.) The CPD is also empowered to create park "advisory councils." (*Id.* ¶ 13.) Advisory councils are groups of volunteers that work with CPD staff to help ensure that Chicago parks function effectively. (R. 33, Def.'s Resp. to Pls.' Facts, ¶¶ 13-17.) With the CPD's permission and oversight, advisory councils can plan and carry out fundraisers using park property in order to generate money for park improvements. (*Id.* ¶¶ 21-22.)

---

[1] In its reply brief, the CPD argues that several statements of material fact set forth in its Local Rule 56.1 statement of uncontested facts should be deemed admitted because the Tongs failed to deny them in the manner prescribed by Local Rule 56.1. (R. 36-1, Def.'s Reply at 1-3.) We will not hesitate to deem facts admitted where the local rule's requirements have not been met, especially because the Court has explained in detail what we expect from summary judgment practitioners under local rule 56.1. *See Malec v. Sanford*, 191 F.R.D. 581, 582-587 (N.D. Ill. 2000). Accordingly, paragraphs 21 and 31 of the CPD's Statement of Uncontested Facts are deemed admitted in their entirety. Paragraph 40 of the CPD's Statement of Uncontested Facts is deemed admitted in part; its legal conclusions will be ignored. *Id.* at 583. We will also ignore paragraph 21 of the CPD's Statement of Uncontested Facts because the information conveyed by the CPD's citations does not support the factual assertions in that paragraph. *Id.* ("Factual allegations not properly supported by citation to the record are nullities.")

**A.      Buy-a-Brick Programs Generally**

One method that advisory councils use to generate funds for Chicago parks is to solicit donations through "buy-a-brick" programs. Buy-a-brick programs provide members of the public with the opportunity to purchase a brick engraved with an inscription chosen by the donor. The engraved bricks are then installed in a designated walkway located in a Chicago park. (*Id.* ¶¶ 23-24.) An advisory council must obtain the CPD's approval to implement a buy-a-brick program and CPD project managers participate in the programs from start to finish. (*Id.* ¶¶ 34-35.) The CPD retains the right to review and approve proposed brick engravings, and makes the final decision as to whether a particular engraving will be accepted or rejected. (*Id.* ¶¶ 36-37.)

The CPD has no written policy specific to buy-a-brick programs that outlines the procedure or criteria that the CPD uses to determine whether to accept or reject a proposed brick engraving. (R. 42, Pls.' Resp. to Def.'s Facts, ¶ 21.) However, the CPD does have a written policy entitled "Guidelines for Plaques, Markers and Donor Recognition in Parks" (the "Donor Guidelines"), which applies "[w]here the primary purpose of a sign, plaque, or marker is to acknowledge donors. . . ." (R. 29, Joint Exs., Ex. 4.) On their face, some of the criteria in the Donor Guidelines are permissive, while others are mandatory. On the one hand, the Donor Guidelines state that "[w]henever possible, the sign should acknowledge a group, rather than the individuals comprising that group[,]" and "[w]here possible, text on signage should recite the significant community service/public contributions of individuals and groups, rather than personal or individual accomplishments. . ." (*Id.*) On the other hand, the Donor Guidelines state that "[w]hen the proposal is to include names as an integral element of a larger installation, *e.g.*, on pavers in a plaza or on the base of a sculpture. . . [n]o logos, seals or other corporate identities

3

are permitted." (*Id.*) The Donor Guidelines do not contain any express prohibition on religious messages. (R. 33, Def.'s Resp. to Pls.' Facts, ¶ 41.)

The Donor Guidelines further state that "[p]laques, boulders, or other signage intended primarily to commemorate or memorialize persons, activities, events, locations, or communities for non-donor recognition purposes shall be considered 'public art' and shall be subject to the Park District's guidelines for acceptance of public art." (*Id.*) The CPD's guidelines for acceptance of public art are located in the CPD Guidelines and Rules of Operation for Public Art Work ("Public Art Guidelines"). (R. 29, Joint Exs., Ex. 9.) The Public Art Guidelines outline a two-phase review procedure in which a proposed work of public art is reviewed by both the CPD's Committee on Recreation, Permits, Park Management and Related Institutions ("Recreation Committee"), and the CPD's Board of Commissioners. (*Id.*) The Public Art Guidelines dictate that the Recreation Committee shall not recommend acceptance of public art works:

> (1) depicting or commemorating individuals who are still living or who have not been deceased for at least five years; (2) depicting or commemorating an event until at least five years after the end of that event; (3) endorsing or advocating religion or a specific religious belief; (4) depicting obscenity or that malevolently portrays, demeans, or intimidates any racial or ethnic group; or (5) of inferior or substandard workmanship.

(*Id.*)

The CPD maintains a separate policy for "Naming and Renaming of Parks and Park Features" ("Naming Guidelines"), which lists criteria applicable to proposed names of parks or park features. (R. 33, Def.'s Resp. to Pls.' Facts, ¶ 40; R. 29, Joint Exs., Ex. 7.) The Naming Guidelines state that "[n]o proposed park or park feature name shall (i) duplicate the name of

4

another park or park feature within the City of Chicago; (ii) endorse or advocate religion or a specific religious belief; (iii) have obscene connotations; or (iv) malevolently portray, demean or intimidate any racial or ethnic group." (R. 29, Joint Exs., Ex. 7.)

The CPD has no written policy that describes how, if at all, the Donor Guidelines, Public Art Guidelines, or Naming Guidelines apply to proposed engravings for buy-a-brick programs. (R. 42, Pls.' Resp. to Def.'s Facts, ¶ 21.) While the CPD maintains the right to review all proposed brick engravings, it has no written policy that outlines what procedures are used to review proposed brick engravings or which CPD staff are responsible for that review. (*Id.*; R. 27, Joint Stip. Facts, ¶ 19.) The CPD's unwritten policy is to deny brick engravings that "contain (a) obscene material or connotations; (b) endorse or advocate religion or a specific religious belief; (c) endorse a specific political party or belief; or (d) malevolently portray, demean or intimidate any racial or ethnic group," and to prohibit engravings "of a political, religious or social nature." (R. 28, Def.'s Facts, ¶ 31.)

A CPD staff member designated by the CPD to explain the formulation of its brick approval policy testified that the CPD decides whether brick engravings will be accepted based on the recommendations of a subgroup known as the Enhancement Committee. (R. 30-3, Pls.' Facts, Ex. 6, Steele Dep. at 89.) A member of the Enhancement Committee, Robert Megquier, testified that if a brick engraving acknowledged someone or something other than the donor, it would become a "public art issue" and would go to the Enhancement Committee for review and recommendation. (*Id.*, Ex. 9, Megquier Dep. at 19, 30-31.) He also testified that no proposed brick engraving has ever come to the Enhancement Committee for review. (*Id.*, Ex. 9, Megquier Dep. at 32, 39, 45-46.) Megquier explained that brick engravings that refer to something other

than the donor "could be rejected by people involved with carrying out the guidelines. They would say that's not appropriate and they would tell the advisory council most likely that's not appropriate." (*Id.*, Ex. 9, Megquier Dep. at 32.) Megquier did not identify who "the people involved with carrying out the guidelines" are. The parties agree, however, that the CPD Enhancement Committee does not regularly review proposed buy-a-brick engravings and that the CPD law department reviews some, but not all, proposed buy-a-brick engravings. (R. 33, Def.'s Resp. to Pls.' Facts, ¶¶ 49, 53.)

## B. The Senn Park Buy-a-Brick Program

Senn Park is owned and supervised by the CPD and is located in Chicago's Edgewater neighborhood. (R. 27, Joint Stip. Facts, ¶ 8.) In approximately June 1999, Kathryn "Kate" Thomas resurrected the previously-defunct Senn Park Advisory Council, became President of the Council, and approached the CPD about generating funds to refurbish Senn Park.[2] (R. 33, Def.'s Resp. to Pls.' Facts, ¶¶ 61-63.) Thomas proposed a Senn Park buy-a-brick program to raise the necessary funds, and the CPD approved that program. (*Id.* ¶¶ 65-66.) The engraved bricks generated through the Senn Park buy-a-brick program would be placed at the entryway to Senn Park. (R. 28, Def.'s Facts, ¶ 31.) A primary purpose of the Senn Park walkway is to provide a safe path leading into the park. (*Id.*) That walkway "was opened to residents of the community for the limited purpose of allowing commemorative messages recognizing donations." (*Id.*)

After receiving the CPD's approval to run the Senn Park buy-a-brick program, Thomas contacted the CPD's Community Outreach Manager of the Department of Intergovernmental

---

[2]Thomas was a volunteer on Senn Park's behalf and has never been employed by the CPD. (R. 27, Joint Stip. Facts, ¶ 11.) The record demonstrates that Thomas has made significant personal contributions of time and advocacy for the betterment of Senn Park.

Community Affairs, Robert Steele, and asked him for information on how to administer the buy-a-brick program. In response, Steele sent Thomas a copy of the CPD's Donor Guidelines. (*Id.* ¶¶ 6, 67-68; *see also* R. 29, Joint Exs., Ex. 4.) Steele did not send Thomas a copy of the Public Art Guidelines or the Naming Guidelines. (R. 33, Def.'s Resp. to Pls.' Facts, ¶¶ 67-68.) The Senn Park project manager, Elizabeth Koreman, instructed Thomas to create a spreadsheet of the donors and proposed engravings for the Senn Park buy-a-brick program and to provide that spreadsheet to the CPD for approval before sending the proposals to the brick vendor for engraving. (*Id.* ¶ 74.)

Thomas circulated approximately 1500-2000 hard copies of advertisements and applications for the Senn Park buy-a-brick program to community members, and posted a copy of the application on the Internet. (*Id.* ¶¶ 69-70.) The CPD did not review those advertisements before Thomas circulated them. (R. 27, Joint Stip. Facts, ¶ 22 .) The Senn Park buy-a-brick advertisements indicated that applicants could "Leave Your Mark on Senn Park" and "Choose Your Words." (R. 29, Joint Exs., Ex. 2.) In response to these solicitations, the Senn Park Advisory Council received a number of applications for buy-a-brick donations.

The Senn Park buy-a-brick applications included proposals for bricks reading: "Peace on Earth;" "Proudly supporting the children of Edgewater State Senator Carol Ronen;" "Bootsie Albert Drennan Best Cat Ever!;" "Plenty of grace be to this place. The Weyandt Family;" "Respect Nature Seek Understanding Truman & Emily;" "Manchester Commons Condo Association 2002;" and "If you build it, they will play. The Cvetas Family." (R. 29, Joint Exs., Exs. 11-13.) Among the applications was a proposed engraving which read as follows: "Your neighbor Immanuel Lutheran Church–With thanks to God for our neighbors." (R. 27, Joint Stip.

7

Facts, ¶ 31.) Also included in the applications was the Tongs' proposal for an engraved brick, which is the subject of the present suit. The Tongs' submission read as follows: "Missy, EB & Baby Tong–Jesus is the cornerstone. Love, Mom and Dad." (*Id.* ¶ 32.)

After receiving these applications, Thomas created several spreadsheets containing the donor names and proposed engravings, and e-mailed them to Koreman. (R. 33, Def.'s Resp. to Pls.' Facts, ¶¶ 74-75.) Koreman's predecessor at the CPD had instructed Koreman to review the proposed engravings and to deliver them to the CPD's law department if she "was worried about anything."[3] (*Id.* ¶ 77.) Koreman, however, was not aware of the guidelines that the CPD applies to determine whether to accept or reject an engraving. (R. 30-3, Pls. Facts, Ex. 7, Koreman Dep. at 25.) Koreman printed all of Thomas's spreadsheets containing all of the proposed engravings for the Senn Park buy-a-brick program and delivered them personally to Nelson Brown, senior counsel of the CPD law department. (R. 33, Def.'s Resp. to Pls.' Facts, ¶¶ 11, 75.)

## C. The CPD's Decision to Reject the Tongs' Proposed Inscription

Brown reviewed the proposed engravings and determined that the only two problematic proposals were those submitted by the Tongs and the Immanuel Lutheran Church. (*Id.* ¶¶ 83-84.) Brown then asked Thomas to determine whether they were willing to change the text for their proposed engravings to exclude their religious references. After Thomas explained the situation to the Immanuel Lutheran Church, it agreed to remove the reference to God from its proposal. The revised inscription read "Your neighbor Immanuel Lutheran Church–With thanks for our neighbors." (R. 27, Joint Stip. Facts, ¶ 35.)

---

[3] Michael O'Neil was the CPD's project manager for Senn Park until the summer of 2002, when he was replaced by Elizabeth Koreman. (R. 27, Joint Stip. Facts, ¶ 26.)

Thomas also contacted the Tongs to determine whether they would be willing to change their proposed inscription. (*Id.* ¶ 37.) The Tongs indicated that they would not change their proposal. On March 31, 2003 Brown sent the Tongs a letter stating that the CPD would not accept their brick application. (*Id.* ¶¶ 38, 40; R. 29, Joint Exs., Ex. 63.) Brown's letter stated that "the [CPD] cannot accept any donors' commemorative bricks that have a religious message." (R. 29, Joint Exs., Ex. 63.) The letter did not refer to any specific CPD policy, but communicated the CPD's concern that installing a brick inscribed with a religious message in public property could violate the Establishment Clause. (*Id.*) Brown's letter encouraged the Tongs to edit their proposal to include a personal expression devoid of religious content. Specifically, Brown invited the Tongs to "reconsider the message you wish to place on your ceramic brick and replace your current message with a non-religious one that expresses something important to your family." (*Id.*)

In approximately April 2003, the engraved bricks were installed in the Senn Park walkway. (R. 27, Joint Stip. Facts, ¶ 43.) The Senn Park walkway included the Immanuel Lutheran Church's brick with the revised inscription, but did not include the Tongs' brick. (*Id.* ¶¶ 39, 43.) The Tongs wrote to Brown on April 11, 2003, informing him that they disagreed with the CPD's Establishment Clause position and indicating their intent to file suit if the CPD did not accept their brick for the Senn Park Walkway. (R. 29, Joint Exs., Ex. 64.) On May 6, 2003, Brown responded, stating that the CPD would "stand on its original decision rejecting this message." (R. 29, Joint Ex. 65.) The Tongs then filed the current action seeking declaratory and injunctive relief. (R. 1; R. 20-2.)

## LEGAL STANDARDS

We will grant a motion for summary judgment where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In resolving a summary judgment motion, the Court will neither decide factual disputes nor weigh conflicting evidence, but instead will limit its inquiry to whether a genuine issue of material fact exists for trial. *E.E.O.C. v. Sears, Roebuck & Co.*, 233 F.3d 432, 436 (7th Cir. 2000). In doing so, we will consider all facts in the light most favorable to the non-moving party. To avoid summary judgment, however, the nonmoving party must submit competent and specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e). When both parties move for summary judgment, the Court will determine "the burden of proof that each party would bear on an issue at trial," and "require that party to go beyond the pleadings and affirmatively to establish a genuine issue of material fact." *Santaella v. Metro. Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).

## ANALYSIS

In their Second Amended Complaint, (R. 14-2), the Tongs claim that the CPD's refusal to accept their proposed engraving for the Senn Park buy-a-brick program because of its religious content violated the Free Speech, Free Exercise, and Equal Protection clauses of both the United States and Illinois Constitutions.[4] Both parties claim that they are entitled to summary judgment

---

[4]Neither party briefed any argument based on the Illinois Constitution claims. We presume this is because Illinois courts adhere to the "lockstep doctrine" in resolving claims brought under the Free Speech, Free Exercise, and Equal Protection clauses of the Illinois

on all counts of the Tongs' Second Amended Complaint. (R. 26-1; R. 30-1.) Viewing all facts in the light most favorable to the CPD, we find that the CPD's refusal to accept the Tong's brick based on its religious expression violated the Free Speech Clause. Because we hold that the CPD's actions violated the First Amendment, we need not address the Tongs' Free Exercise and Equal Protection claims.

## Violation of the Free Speech Clause

It is well-settled that private religious speech is protected by the First Amendment. *Capital Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753, 760 (1995). The extent to which the government can exercise control over its property for the purpose of regulating protected speech depends on the nature of the relevant forum. *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 800 (1985). Under the Supreme Court's forum analysis, we must first identify the nature of the forum at issue and then decide whether the government's justifications for excluding the identified speech satisfy the requisite standard for that forum. *Id.* Traditionally, the Supreme Court has recognized three separate forum designations: the nonpublic forum, the designated public forum, and the public forum. *Id.* More recently, the Supreme Court also acknowledged a fourth category: the limited public forum. *See, e.g., Good*

---

Constitution. *Nevitt v. Langfelder*, 623 N.E.2d 281, 284 (Ill. 1993) (state and federal equal protection claims determined under same standards); *People v. DiGuida*, 604 N.E.2d 336, 342-43 (Ill. 1992) (lockstep doctrine applies to free speech claims); *Mefford v. White*, 770 N.E.2d 1251, 1260 (Ill. App. Ct. 2002) (lockstep doctrine applies to free exercise claims). The lockstep doctrine dictates that Illinois courts should construe the Illinois Constitution in the same manner as the United States Supreme Court construes similar provisions of the Federal Constitution. *DiGuida*, 604 N.E.2d at 342. We will review the Tongs' claims under the Federal and Illinois Constitutions side-by-side, bearing in mind that the Free Speech clause of the Illinois Constitution provides even broader protection of speech than does the Federal Constitution. *See id.*

11

*News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106-07 (2001).

A public forum exists where a property "by long tradition or by government fiat" has been "devoted to assembly and debate." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983). Government-owned parks and sidewalks are quintessential examples of traditional public fora. *Doe v. Small*, 964 F.2d 611, 618 (7th Cir. 1992). Government regulation of speech in a public forum is subject to strict scrutiny, and content-based exclusions will only be upheld where they are "necessary to serve a compelling state interest" and are "narrowly drawn to achieve that end." *Perry*, 460 U.S. at 45. A designated public forum exists where the government intentionally opens an otherwise nonpublic forum to public discourse. *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 677 (1998). Strict scrutiny also applies to speech restrictions in a designated public forum. *Id.* In a nonpublic forum, government regulation of speech is permissible as long as the content-based restrictions are reasonable and viewpoint neutral. *Cornelius*, 473 U.S. at 800. The Supreme Court has also recognized a fourth type of forum designation: the limited public forum. *Good News Club*, 533 U.S. at 106-07. A limited public forum exists where the government reserves access to its property "for certain groups or for the discussion of certain topics." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). Content-based restrictions in a limited public forum "must be viewpoint-neutral and reasonable in light of the purpose served by the forum." *DeBoer v. Vill. of Oak Park*, 267 F.3d 558, 566 (7th Cir. 2001).

The relevant forum for First Amendment analysis depends on the access sought by the speaker. *Cornelius*, 473 U.S. at 801. The relevant forum in this case is the Senn Park walkway where the buy-a-brick program bricks were installed, rather than the park as a whole. (*See* R. 32,

Def.'s Resp. at 2; R. 30-2, Pls.' Mot. at 15-17.) The CPD argues that the walkway is a nonpublic forum or, at most, a limited public forum where speech restrictions must simply be reasonable and viewpoint neutral. (R. 26-2, Def.'s Mot. at 6-8.) The Tongs argue that the walkway is a designated public forum, subject to strict scrutiny. (R. 30-2, Pls.' Mot. at 14.)

As discussed below, we find that the CPD's exclusion of the Tongs' brick bearing the message "Jesus is the cornerstone" amounted to viewpoint discrimination. The CPD's actions therefore are impermissible regardless of the forum designation. It is, therefore, unnecessary for us to resolve the forum designation issue here. *DeBoer*, 267 F.3d at 566-67 (declining to resolve issue of forum designation where government engaged in impermissible viewpoint discrimination).

## A.    Viewpoint Discrimination

The parties here disagree as to whether the CPD's policy as applied to the Tongs' proposed engraving is a regulation based on content or viewpoint. The CPD argues that, because the brick walkway in Senn Park is either a nonpublic or limited public forum, its policy against permitting any religious inscriptions on bricks is a permissible content-based restriction rather than viewpoint discrimination. (R. 32, Def.'s Resp. at 7-11.) The CPD maintains that it excludes messages from bricks that advocate a religious, political, or social idea, regardless of the point of view. (R. 28, Def.'s Facts, ¶ 40.) The Tongs, on the other hand, argue that their brick was excluded because of its religious viewpoint on the otherwise includible subject matter of "the 'mark' that the donor wishes to leave[.]" (R. 30-2, Pls.' Mot. at 19.)

As noted above, regardless of the nature of the forum at issue, governmental restrictions based on the content of speech must be reasonable and viewpoint neutral. *Cornelius*, 473 U.S. at

13

806. While content-based discrimination may be permissible where it preserves the purposes of a limited forum, viewpoint discrimination is "presumed impermissible when it is directed against speech otherwise within the forum's limitations." *Rosenberger*, 515 U.S. at 829-30. The Supreme Court has clarified the distinction between content-based restrictions and viewpoint discrimination as follows:

> [a]lthough a speaker may be excluded from a nonpublic forum if he wishes to address a topic not encompassed within the purpose of the forum . . . or if he is not a member of the class of speakers for whose especial benefit the forum was created . . . the government violates the First Amendment when it denies access to a speaker solely to suppress the point of view he espouses on an otherwise includible subject.

*Cornelius*, 473 U.S. at 806. In other words, if the Tongs' proposed inscription fell within the included subject matter for which the Senn Park walkway was opened, the CPD cannot exclude the message because of its religious viewpoint on that subject matter.

The Supreme Court's discussions of viewpoint discrimination in two cases involving exclusion of religious speech from public school property are instructive here. *See Good News Club*, 533 U.S. 98; *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384 (1993). In *Lamb's Chapel*, an evangelical church challenged a public school policy allowing school facilities to be used for social, civic, and recreational meetings but disallowing use of the facilities for religious purposes. 508 U.S. at 386-87. The defendant school district twice rejected the plaintiff's application to use school facilities to show a film series discussing Christian family values and addressing issues such as child rearing and family conflict from a Christian perspective. *Id.* at 388-89. The school district stated that it rejected the application because the activity "appear[ed] to be church-related" and thus violated the district's uncontested policy of prohibiting use of school facilities for religious purposes. *Id.* at 389. The Supreme Court found

14

that child rearing and family values were otherwise included under the category of social and civic meetings. *Id.* at 393-94. The Court held that the school district engaged in impermissible viewpoint discrimination by rejecting the plaintiff's application simply because its presentation on an otherwise includible subject would have been given from a religious perspective. *Id.*

In *Good News Club*, the plaintiff again challenged a school district's policy that made school facilities available for social, civic, and recreational meetings, but prohibited their use for religious purposes. 533 U.S. at 102-03. The plaintiff wished to use school facilities to conduct meetings during which children would hear Bible stories, learn Bible verses, and engage in prayer. *Id.* at 103. The school district admitted that its school-use policy permitted groups such as the Boy Scouts to use school facilities to teach moral values and character development. *Id.* at 108. The school district defended its exclusion of the plaintiff by arguing that their activities amounted to religious instruction. *Id.* The Supreme Court found that even activities that are "'decidedly religious in nature' can[] also be characterized properly as the teaching of morals and character from a particular viewpoint." *Id.* at 111. The Court held that the school district's exclusion of the Good News Club's activities constituted unconstitutional viewpoint discrimination because other groups were allowed to use the facilities to teach morals and character from a secular viewpoint. *Id.* at 112.

More recently, the Seventh Circuit applied the reasoning in *Lamb's Chapel* and *Good News Club* to strike down a similar policy for public use of a village hall. *DeBoer*, 267 F.3d at 568-69. The plaintiffs in *DeBoer* challenged the Village of Oak Park's use policy that required that: "(1) the event provide a civic program or activity that 'benefits the public as a whole' and (2) that an event 'not be based on or must not promote or espouse the philosophy, ideas or beliefs

of any particular group, entity or organization." *Id.* at 562. The Village construed the "civic program or activity" clause to exclude any event involving religious activity. *Id.* at 567. Citing this policy, the Village rejected the plaintiffs' application to use the village hall for a National Day of Prayer assembly. *Id.* at 562. The Seventh Circuit held that the National Day of Prayer assembly qualified as a "civic activity" and that the Village's denial of plaintiffs' application amounted to viewpoint discrimination. *Id.* at 568. The court reasoned that by construing the assembly as religious activity rather than civic activity, "the Village has discriminated against the speech of those of its citizens who utilize these forms of expression to convey their point of view on matters relating to the government." *Id.*

The question of whether the CPD engaged in viewpoint discrimination when it rejected the message "Jesus is the cornerstone" hinges on whether that speech falls within the included subject matter to which the bricks in the Senn Park walkway were opened. *Cornelius*, 473 U.S. at 806. This inquiry is complicated by the CPD's lack of a written policy describing the appropriate subject matter for buy-a-brick program engravings, despite the fact that the CPD has used buy-a-brick programs since the early 1990's. (R. 42, Pls.' Resp. to Def.'s Facts, ¶ 21; R. 33, Def.'s Resp. to Pls.' Facts, ¶ 26.) The absence of a CPD policy defining the scope of the subject matter does not save them from the viewpoint discrimination inquiry, because "[t]he absence of an explicit list of permissible subjects upon which discourse is permissible . . . does not mean that there is no 'otherwise includible subject' for discussion in the forum." *Grossbaum v. Indianapolis-Marion County Bldg. Auth.*, 63 F.3d 581, 590 (7th Cir. 1995).

The parties agree that one purpose of the Senn Park walkway was to raise funds for park refurbishment. (R. 40, Pls.' Resp. to Def.'s Add'l Facts, ¶ 57.) We have deemed admitted that

the CPD opened the walkway to community members for the limited purpose of providing "commemorative messages" recognizing donations. (R. 28, Def.'s Facts, ¶ 31.) But it is undisputed that the CPD's interpretation of "commemorative messages" was expansive enough to include inscriptions that "express something important" to the donor's family. (R. 29, Joint Exs., Ex. 63.)

In *Lamb's Chapel* and *Good News Club*, the Supreme Court found that showing films on child rearing from a Christian perspective and meetings involving prayer and Bible study fell within the subject matter of "social and civic activities." *Good News Club*, 533 U.S. at 109; *Lamb's Chapel*, 508 U.S. at 393-94. Our task is to determine whether the message "Jesus is the cornerstone" falls within the subject matter of commemorative messages that express something important to the donor's family. The record reveals that the CPD had an expansive view of the term "commemorative messages." A CPD representative testified that the brick inscriptions may include the donor's identity and "community messages that may be encouraging in a general sense to the broader public[.]" (R. 30-3, Pls.' Facts, Ex. 6, Steele Dep. at 58.)

A review of the brick engravings that the CPD allowed under this policy reinforces the CPD's broad definition of commemorative messages. Nelson Brown, one of the CPD lawyers who reviewed the Senn Park proposals, stated that the inscriptions "Respect Nature, Seek Understanding Truman & Emily," "Plenty of grace be to this place, the Weyandt family," and "If you build it they will play. The Cvetas family" were all messages that fell within the CPD's policy and were includible in the walkway. (R. 30-3, Pls.' Facts, Ex. 10, Brown Dep. at 43-44.) The CPD also allowed the following "commemorative messages" to appear in the Senn Park walkway: "Playing Should Be FUN 1528-30 W. Thorndale Condo Association;" "Bootsie Albert

17

Drennan Best Cat Ever!;" "Peace on Earth;" and "To Sen. Carol Ronen Thanks for your commitment & vision From the Early Childhood Network of Edgewater & Rogers Park."[5] (R. 30-3, Pls.' Facts, Exs. 3 & 4.)

As revealed throughout the record, the CPD's intent to open the Senn Park walkway to commemorative messages extended to statements of praise for other people and animals, statements of personal belief, and expressions of goodwill. Community members whose commemorative messages included sentiments about the greatness of their pets, their desire for "Peace on Earth," or their wish that "plenty of grace" be with Senn Park all fell within the included subject matter. The buy-a-brick program was open to the personal statements of belief that "Bootsie Albert Drennan [is the] Best Cat Ever!"and that "Playing should be FUN." Under the policy as effectuated by the CPD, the Tongs could have submitted an engraving stating that "Bootsie is the cornerstone." Because the Tongs wished to commemorate their personal belief that *Jesus* is the cornerstone, however, their application was rejected. The CPD therefore violated the Tongs' First Amendment rights by excluding their religious viewpoint on the otherwise included subject matter.

The CPD argues that there is no viewpoint discrimination here because its policy "prohibits all text that endorses religion or a specific religious belief." (R. 32, Def.'s Resp. at 9.) This argument, however, mischaracterizes the relevant inquiry. In *Lamb's Chapel*, the Supreme Court noted that the fact that the school's policy treated all religions the same does not resolve

[5]The record also reveals that the CPD has allowed brick engravings in other Chicago parks with the following commemorative messages: "Laughter is the music of the soul"; "A park is but a canvas to the imagination Roscoe Village Neighbors"; and "No one could have better friends than those of Ehrler Park Senator R Hendon." (R. 30-3, Pls.' Facts, Ex. 1, Creswell Aff., ¶ 4.)

whether the policy discriminates on the basis of viewpoint. *Id.* at 393. Instead, the question is whether a speaker is prevented from making a statement from a religious perspective on a topic that other speakers are free to discuss. *Id.* Here, for example, Immanuel Lutheran Church was free to make a general statement of thanks for its neighbors, but was not allowed to say that it gave that thanks to God. (R. 27, Joint Stip. Facts, ¶¶ 35, 39.) Other speakers were free to make statements of personal belief, such as the belief that Bootsie is the greatest cat ever, but the Tongs were prevented from making a statement of personal belief because their statement made a reference to Jesus. The Tongs' statement was includible in the subject matter of the walkway but was excluded because of its religious perspective.

We understand the CPD's concerns that, if forced to include the Tongs' inscription, it will be forced to accept all religious messages, including some that may be offensive to the community at large. (R. 32, Def.'s Resp. at 7.) The CPD can protect itself in the future from this perceived problem, however, by creating a narrower definition of the "includible subject matter" for its buy-a-brick programs. By limiting inscriptions to names of donors and their immediate family, for example, and by clearly communicating those limitations to potential donors, the CPD might avoid dilemmas such as the one presented here.

We are less sympathetic to the CPD's assertion that its prohibition on any religious expression is necessary to "avoid an appearance of endorsing religious beliefs" in violation of the Establishment Clause. (R. 32, Def.'s Resp. at 8.) Through buy-a-brick programs, the CPD opens park walkways to the public at large, the diverse inscriptions are all gathered together in a designated space, and many of the brick engravings identify the sponsor of the message on their face. Given these circumstances, "there would have been no realistic danger that the community

would think that the [CPD] was endorsing religion or any particular creed, and any benefit to religion . . . would have been no more than incidental." *Lamb's Chapel*, 508 U.S. at 395. Establishment Clause concerns do not justify "a refusal to extend free speech rights to religious speakers who participate in broad-reaching government programs neutral in design." *Rosenberger*, 515 U.S. at 839. The Seventh Circuit has "regularly noted that maintaining a neutral policy avoids establishment of religion difficulties." *Grossbaum*, 63 F.3d at 593. Thus, the CPD can best protect itself from these concerns by maintaining an even-handed approach to its policy for brick inscriptions in its buy-a-brick programs.

At the heart of this matter lies the uncontested fact that the CPD invited the Tongs to submit an inscription that expressed something that was important to them as a family, as long as that sentiment was not a religious one. (R. 29, Joint Exs., Ex. 63.) In deciding to open up broadly the subject matter of buy-a-brick program engravings to commemorative messages that are important to a donor or the donor's family, the CPD put itself in a position to play editor to root out such expressions that include a religious viewpoint. This level of government interference with private speech is exactly the kind of activity that the First Amendment is designed to curtail. *See Rosenberger*, 515 U.S. at 845-46 (stating that policies that require government officials to scan and interpret texts to "discern their underlying philosophic assumptions respecting religious theory and belief . . . was a denial of the right of free speech and would risk fostering a pervasive bias or hostility to religion, which could undermine the very neutrality the Establishment Clause requires"). Thus, we find that the Tongs are entitled to summary judgment based on the CPD's unlawful viewpoint discrimination in violation of the Tongs' First Amendment rights.

20

## B.    Prior Restraint

Even if we found that the CPD's refusal to accept the Tongs' proposed engraving were constitutionally permissible, the CPD's policy for buy-a-brick engravings is nevertheless vulnerable to a First Amendment attack as a prior restraint on speech.[6]   The Tongs argue that the CPD's policy for reviewing proposed engravings—or lack thereof—amounts to an unconstitutional prior restraint on speech because it confers unfettered discretion on the CPD to decide whether to accept or reject a submission.  (R. 30-2, Pls.' Mot. at 1-14.)  We agree.

"A prior restraint exists when a law gives public officials the power to deny use of a forum in advance of actual expression." *Weinberg v. City of Chi.*, 310 F.3d 1029, 1045 (7th Cir.), *cert. denied*, 124 S. Ct. 78 (2003) (internal quotations omitted).  The CPD's policy is a prior restraint, because it allows officials to deny expression before it takes place.  (R. 27, Joint Stip. Facts, ¶ 19.)  We must decide whether the standards guiding the CPD officials who oversee the approval of brick engravings are sufficiently narrow and definite to survive First Amendment scrutiny. *See Weinberg*, 310 F.3d at 1045.

A prior restraint is unconstitutional where the government grants itself unfettered discretion to determine whether to allow certain speech. *Id.* at 1045.  Unbridled discretion exists

---

[6]Contrary to the CPD's arguments, we need not find that the Senn Park walkway is a public forum in order to apply the prior restraint doctrine.  (R. 32, Def.'s Resp. at 12.)  The Seventh Circuit's decision in *DeBoer* illustrates that whether a regulation governing access to a forum is an unconstitutional prior restraint is a distinct inquiry from the forum determination.  27 F.3d at 567, 573.  Other circuits have conducted a prior restraint analysis to an ordinance governing a nonpublic forum. *See Griffin, III v. Sec'y of Veteran Affairs*, 288 F.3d 1309, 1323 (Fed. Cir.), *cert. denied*, 573 U.S. 947 (2002); *Sentinel Communications Co. v. Watts*, 936 F.2d 1189, 1199 n.11 (11th Cir. 1991).  As a result, we may examine the CPD's buy-a-brick policy to determine if it confers unfettered discretion on decision-makers and thus acts as an unconstitutional prior restraint.

where "it simply cannot be said that there are any narrowly drawn, reasonable and definite standards guiding the hand" of the government administrator. *Forsyth County v. The Nationalist Movement*, 505 U.S. 123, 132-33 (1992) (internal quotations and citations omitted). The prohibition on unbridled discretion applies "even if the discretion and power are never actually abused." *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 757 (1988). Where "the lack of specificity in the procedure and the amount of discretion vested in the official lends itself to manipulation by the City . . . [a court] cannot presume that officials will act in good faith and allow standards not explicitly contained in the ordinance." *Weinberg*, 310 F.3d at 1046 (citing *Lakewood*, 486 U.S. at 770).

"[T]he prohibition against unbridled discretion is a component of the viewpoint-neutrality requirement." *Southworth v. Bd. of Regents of the Univ. of Wis. Sys.*, 307 F.3d 566, 579 (7th Cir. 2002). Limits on official discretion are necessary to prevent "the risk of self-censorship, where the plaintiff may edit his own viewpoint or the content of his speech to avoid governmental censorship; and . . . the risk that the decisionmaker will use its unduly broad discretion to favor or disfavor speech based on its viewpoint[.]" *Id.* at 579. A level of specificity in prior restraints is essential because "*post hoc* rationalizations by the licensing official and the use of shifting or illegitimate criteria are far too easy, making it difficult for courts to determine in any particular case whether the licensor is permitting favorable, and suppressing unfavorable, expression." *Lakewood*, 486 U.S. at 758. While the limits on official discretion do not necessarily have to be set forth in a written policy, implicit or unwritten limits must be made clear by "textual incorporation, binding judicial or administrative construction, or well-established practice." *Id.* at 770.

The CPD admits that it has no written policy that lays out all of the rules for reviewing proposed buy-a-brick engravings. (R. 34, Pls.' Resp. to Def.'s Facts, ¶ 21.) However, the CPD argues that its policy against accepting religious or political messages is made explicit through its "practice and policy." (R. 26-2, Def.'s Mot. at 4-5.) In its response brief, the CPD explains this policy as follows:

> The Park District "Donor Guidelines" apply to the portion of an engraving that acknowledges the identity of the donor, and allow only the identity of the donor. With respect to any engraving that is not intended to recognize the donor, the Park District prohibits text that is obscene or that malevolently portrays any racial or ethnic group. And, with respect to such non-donor recognition engravings, the Park District also prohibits text that endorses or advocates religion or a specific religious belief.
> * * *
> [The CPD] does not apply its policy on naming parks, or its Public Art Guidelines . . . . [I]t applies *some of the same criteria* to brick engravings as it does to naming parks and public art.

(R. 32, Def.'s Resp. at 1) (emphasis in original). The CPD's explanation of its purported policy is not supported by the record in this case, even when all evidence is reviewed in the light most favorable to the CPD.

### i.     The CPD's Procedural Policy

The evidence demonstrates that the CPD has no procedural policy governing how proposed buy-a-brick engravings are reviewed. The CPD admits that it does not review all proposed engravings. (R. 33, Def.'s Resp. to Pls.' Facts, ¶¶ 42, 49, 53.) It has not explained, however, who decides whether proposed engravings will be reviewed and what criteria are used to make that determination.

The Senn Park buy-a-brick program illuminates the CPD's lack of any coherent procedure for reviewing a proposed engraving. The president of the Senn Park Advisory Council

submitted the buy-a-brick applications to Koreman, the CPD project manager for Senn Park. (R. 27, Joint Stip. Facts, ¶ 29.) Koreman had been instructed by her predecessor to review the proposed engravings and to turn them over to the law department if she "was worried about anything." (R. 33, Def.'s Resp. to Pls.' Facts, ¶ 77.) Koreman testified that she did not know what the CPD's policy was for rejecting or accepting bricks. (R. 30-3, Pls.' Facts, Ex. 7, Koreman Dep. at 25.) That the CPD lacks a procedure ensuring that all proposed engravings are reviewed by officials who are equipped to apply its substantive policy creates a substantial risk that, in some cases, its policy would not be applied at all.

The CPD also has failed to explain who is responsible for applying its substantive policy once it decides to review a proposed engraving. Some of the CPD's representatives explained that the authority to make recommendations about whether to accept an engraving lies at least in part with the members of the Enhancement Committee. (*Id.*, Ex. 5, Garcia Dep. at 68; Ex. 6, Steele Dep. at 89.) However, one member of that committee pointed out that, at least since 2001, the Enhancement Committee has never actually reviewed a brick. (*Id.*, Ex. 9, Megquier Dep. at 18, 32, 39, 45-46.) Indeed, the Tongs' message was not reviewed by the Enhancement Committee or any other CPD committee, (R. 33, Def.'s Resp. to Pls.' Facts, ¶ 82), but was reviewed and rejected by the CPD law department, (R. 27, Joint Stip. Facts, ¶¶ 33, 40). The CPD law department does not, however, review all proposed buy-a-brick engravings. (R. 33, Def.'s Resp. to Pls.' Facts, ¶ 53.)

### ii.    The CPD's Substantive Policy

The standards that the CPD actually applied when reviewing bricks are as troublesome as its procedure for determining which bricks to review. In *DeBoer*, the Seventh Circuit found that

the confusion among government officials as to the policy's meaning created "too great a risk that it could be used to engage in prohibited censorship of speech." 267 F.3d at 574. As in *Deboer*, the CPD's buy-a-brick policy "is not given structure or substance by any written standards and its meaning escapes even the [CPD] officials charged with administering and interpreting [it]." *Id.* Although the CPD contends that it is limited in part by the Public Art criteria, (R. 32, Def.'s Resp. at 1), CPD representatives gave conflicting and confusing explanations of how that policy is carried out.

The record is replete with examples of the CPD's confusion. At various points, CPD representatives testified that an engraving could be rejected if it is "not appropriate," "distasteful," or would create a "hazard." (R. 30-3, Pls.' Facts, Ex. 9, Megquier Dep. at 32; Ex. 6, Steele Dep. at 102, 64-65.) Megquier testified that the engraving "Club Lucky, 1824 West Wabansia, Good Food & Fun" does not violate a policy prohibiting advertising on bricks because "it is so generic that it is not really a form of advertising." (*Id.*, Ex. 9, Megquier Dep. at 69-70.) He also testified that the Donor Guidelines apply to "Greetings from Lily, The Wonder Dog" because "in the spirit of donating money to a park, that is probably not completely unreasonable that somebody would say my cat donates fifty bucks or my dog donates a hundred bucks." (*Id.*, Ex. 9, Megquier Dep. at 76-77.) Steele testified that he would "[a]bsolutely" reject an inscription that did not appeal to "a significant proportion of residents," and that "Best Cat Ever" would not be of "great appeal, because there may be a lot of dog lovers in that area." (*Id.*, Ex. 6, Steele Dep. at 111-12.) CPD's counsel testified that "Plenty of grace be to this place, The Weyandt family" and "Respect nature, seek understanding" were acceptable inscriptions, although the CPD prohibits "social" messages. (*Id.*, Ex. 10, Brown Dep. at 26, 43-44.)

The CPD's conflicting explanations for how the Tongs' submission violated its substantive policy further highlights the inherent ambiguity in that policy. Steele explained that the Tongs' brick violates an implicit rule excluding "personal beliefs" from the bricks. (R. 30-3, Pls.' Facts, Ex. 6, Steele Dep. at 67.) Steele testified, however, that the inscription "No One Could Have Better Friends than Those of Ehrler Park. Senator Ricky Henden" was acceptable because it represented an opinion, not a belief.[7] (*Id.* at 95-96.) Remarkably, Steele also suggested that the Tongs' submission violated the Donor Guidelines' prohibition against engravings including corporate identities because Jesus is a "corporate identity" for religion. (*Id.* at 63-64). At the same time, the CPD contends that bricks such as "Senn Park Supporter - Einstein Bros Bagels Andersonville," "Handico, Inc. Chicago's Premier Handyman Service," and "North Community Bank - Community is our middle name," each of which the CPD allowed in buy-a-brick walkways, do not contain "corporate identities" in violation of that rule. (R. 33, Def.'s Resp. to Pls.' Facts, ¶ 52.) Clearly, those who the CPD designated to explain its buy-a-brick policy are confused as to its standards, if they are aware of any policy at all.

Ultimately, the CPD's legal arguments amount to an effort to cobble together the pieces of a scattered policy. But *post hoc* explanations of an unclear policy cannot revive a constitutionally defective policy. *Lakewood*, 486 U.S. at 758. Because the CPD policy is unwritten, and is applied in an incoherent and inconsistent manner, the CPD effectively grants unfettered discretion to whichever CPD staff member—if any—first comes into contact with a buy-a-brick application. The CPD has simply not governed its own decision-making by "narrow, objective, and definite standards," *Deboer*, 267 F.3d at 573 (internal quotations omitted), and its

---

[7]Steele admitted later that this message could be construed as a personal belief. *Id.*

policy demonstrates a "lack of specificity in the procedure and the amount of discretion vested in the official[s]," *Weinberg*, 310 F.3d at 1046 (citing *Lakewood*, 486 U.S. at 770). Thus, its policy is an unconstitutional prior restraint in violation of the First Amendment and the Tongs are entitled to declaratory and injunctive relief.[8] Accordingly, we order the CPD to include a brick in the Senn Park walkway bearing the following inscription: "Missy, EB & Lexi Tong–Jesus is the cornerstone. Love, Mom and Dad."[9]

## CONCLUSION

For the reasons stated above, we deny Defendant Chicago Park District's motion for summary judgment, (R. 26-1), and grant Plaintiffs Robert and Mildred Tongs' motion for summary judgment, (R. 30-1). While we recognize the difficulty the Chicago Park District faced in creating substantive guidelines that would provide community members with incentives to donate to buy-a-brick programs, the government cannot broadly invite the public to express something of importance to them and then exclude such an expression because of its religious viewpoint. The Clerk of the Court is instructed, pursuant to Federal Rule of Civil Procedure 58, to enter judgment in favor of Plaintiffs Robert and Mildred Tong and against Defendant Chicago Park District.

ENTERED: _____

**Judge Ruben Castillo**
**United States District Court**

**Dated: April 29, 2004**

---

[8]The Court notes that both parties also claim that they are entitled to summary judgment on Plaintiffs' Free Exercise and Equal Protection claims under the United States and Illinois Constitutions. We decline to address these claims because we have already found as a matter of law that the Tongs are entitled to declaratory and injunctive relief based on the CPD's violation of their First Amendment rights.

[9]The Tongs indicated in their April 11, 2003 letter to the CPD that the baby referred to in their original application had been born, and they wished to update their proposal by substituting the child's name, Lexi, for the word "Baby." (R. 29, Joint Exs., Ex. 64.)